UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHELLE GROEN,

   Plaintiff,

v.             Case No. 21-cv-12792
              HON. MARK A. GOLDSMITH

UNITED STATES OF AMERICA,

    Defendant.
_____/

## OPINION & ORDER CONTAINING FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING BENCH TRIAL

  Plaintiff Michelle Groen brings this suit in negligence against the United States under the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq., as a result of an accident involving the vehicle she was driving and a U.S. Postal Service tractor-trailer driven by postal employee Brandon Perry. The accident occurred on a two-lane road, when the postal truck crossed the center line and struck Groen's vehicle on the front right quadrant of her car.

  The Court conducted a one-day bench trial on August 26, 2024, where the parties focused on three central issues: (i) whether Perry's crossing of the center line was a result of his uncontrollable sneezing immediately before crossing the center line, such that any negligence would be excused under the "sudden emergency" doctrine; (ii) to what extent Groen's issues with her back and neck resulted from the accident; and (iii) how impactful the resultant injuries were in terms of money damages.

  The Court answers these questions in its findings and conclusions below, pursuant to Federal Rule of Civil Procedure 52. It holds that the "sudden emergency" doctrine was not triggered; that some of Groen's current health difficulties are traceable to the accident; and that

such injuries justify a monetary award against the Government. In reaching its conclusions, the Court resolves the Government's challenges to expert witnesses called by Groen. It sustains the challenge to certain opinions offered by Groen's accident-reconstruction expert as impermissible legal conclusions. But it rejects the Government's challenges to her medical experts.

## I. BACKGROUND[1]

### A. The Accident

The parties agree that, on the morning of May 5, 2020, Groen and Perry were driving in opposite directions on M-36, a two-lane road in Hamburg Township, Michigan. Police Report (Tr. Ex. 19, Dkt. 44-3); Perry Test. at PageID.1173–1174, 25:24–26:1 (Dkt. 57). Groen was behind the wheel of her Pontiac G6. Police Report at PageID.437 (Tr. Ex. 19). Perry was driving a USPS semi-truck in the scope of his federal employment. Perry Test. at PageID.1172, 24:17–21. Perry crossed the center line, and, after striking Groen's car, drove into a creek abutting the roadway. Id. at PageID.1196, 48:3–23. The parties agree that there was nothing Groen could have done to prevent the accident. Id. at PageID.1200, 52:1–3.

### B. The Sneezes

Perry claims that he drove into Groen's lane, and eventually the adjacent creek, because he was overcome by a sneezing fit, consisting of two or three powerful sneezes. Petty Test. at PageID.1190, 42:3–8. The sneezes, by his telling, happened as he was driving about 20 to 25 miles per hour and caused him to jerk the steering wheel to the left. Id. at PageID.1190, 42:17–23; PageID.1214–1215, 66:24–67:11. That, in turn, led him across the center line. Id. at PageID.1216, 68:14–17. Nevertheless, Perry recounted that he was still able to see traffic around him and had

---

[1] After trial, the parties filed proposed findings of fact and conclusions of law (PFFCL). See Pl. PFFCL (Dkt. 58); Def. PFFCL (Dkt. 59).

felt the sneezes coming on. Id. at PageID.1193–1194, 45:14–46:6; PageID.1215–1216, 67:19–68:10.

Perry did not mention the sneezes when he gave a report to the responding police officer immediately after the accident. Perry Test. at PageID.1183–1184, 35:3–36:3.  He first mentioned them when filling out an incident report for his employer the next day, admitting later that he was concerned about possibly losing his job, when he filled out the report.  Id. at PageID.1217, 69:9–14.

The Court does not conclude that Perry did not sneeze while driving that morning.  But it does conclude that Perry did not suffer sneezes powerful enough to cause him to lose control of his vehicle, given that he did not mention them to the responding officer.  Thus, while Perry may have sneezed that morning, his sneezes were not disabling.

### C.  Groen's Alleged Injuries

Over roughly a three-year period following the accident, Groen had surgeries on her shoulder, neck, and lower back.  She believes the accident caused each of the underlying injuries, which she says led to the surgeries.  Groen had no documented history of shoulder or neck issues before the accident.   She had documented chronic back pain, though the recency of those symptoms is in dispute.  Groen Test. PageID.1355–1357, 207:10–209:13 (Dkt. 57).  What follows is a timeline of Groen's examinations and treatments, as well as a discussion of her doctors' causation conclusions.

#### 1.  Initial Examination and Treatments

Immediately following the accident, Groen complained of lower back pain but not of shoulder or neck pain.  Groen Test. at PageID.1338–1339, 190:24–191:5.  The next day, however, Groen saw a chiropractor and complained of pain in her back, her neck, her shoulders, and her right

knee Groen Test. at PageID.1343–1344, 195:15–196:7; Hesselberg Intake (Tr. Ex. 22, Dkt. 44-22).  The chiropractor referred Groen for MRIs of her spine.  Groen Test. at PageID.1345, 197:3–6; LIV Open MRI, Cervical Spine (Tr. Ex. 27, Dkt. 44–9).

In the months that followed, Groen underwent conservative treatment, including physical therapy.  Swift Dep. at PageID.968, 16:11–21 (Dkt. 54-1); Schoenherr Dep. at PageID.744–745, 39:1–40:5 (Dkt. 50-2).  She would ultimately seek further treatment and have shoulder surgery in October 2020.  Swift Operative Rep. (Tr. Ex. 46, Dkt. 44-7).  At some point between the accident and her surgery, Groen experienced intense shoulder pain when she attempted to pull herself up into a truck.  Groen Test. at PageID.1321–1322, 173:24–174:10.

### 2.  Further Treatment and Shoulder Surgery by Dr. Swift

Three months after the accident, Groen sought further treatment at Performance Orthopedics, where she met with Dr. Pavan Tankha.  Tankha Initial Encounter (Tr. Ex. 34, Dkt. X).  Groen complained of headaches and pain in her neck, shoulders, and lower back.  Id.  She had not experienced those symptoms before the accident.  Id.  After Groen experienced intense shoulder pain getting into a truck, as described above, Tankha decided to order an MRI of Groen's shoulder.  Groen Test. at PageID.1321–1322, 173:24–174:10; Tankha Initial Encounter.  That MRI indicated that Groen had a torn rotator cuff.  LIV Open MRI, Right Shoulder (Tr. Ex. 35, Dkt. 44-6).

Groen was later referred to Dr. Robert Swift.  Swift Dep. at PageID.964–965, 12:24–13:5.  Swift, whose practice was 70% pain management at the time, recommended and performed surgery on Groen's shoulder.  Swift Dep. at PageID.962–963, 10:22–11:19; PageID.970–972, 18:12–20:124.  Swift's rotator cuff surgery was successful, and Groen was released from shoulder rehab by December 15, 2020.  Swift Progress Note (Tr. Ex. 69, Dkt. 44-8).

Swift ultimately determined that Groen had suffered an acceleration/deceleration injury to her shoulder. Swift Dep. at PageID.977–978, 25:8–26:7.  Swift testified that this type of injury was consistent with the story Groen provided—that she had been in a car accident and had no prior shoulder issues.  Id.  However, Swift did not perform a formal differential diagnosis or review the car accident report. Swift Dep. at PageID.1005–1008, 53:11–56:8.  Additionally, Swift confirmed that other activities could cause acceleration/deceleration injuries of the type that Groen suffered, including racket sports, combat sports, and falls.  Id. at PageID.1007–1008, 55:20–56:5.  Swift did not inquire into these other possible causes.  Id. at PageID.1008, 56:6–8.

### 3.  Examination by Independent Medical Examiner, Dr. Orloski

Dr. Kevin Orloski performed an independent medical examination on Groen in connection with this litigation, on November 2, 2020, shortly after her shoulder surgery.  Orloski Dep. PageID.657, 9:13–15 (Dkt. 50-1).  Orloski reviewed accident reports and Groen's medical records. He also conducted his own physical examination of Groen.  Id. at PageID.658–664,10:5–16:11. Orloski found that Groen's neck and upper extremities were of normal strength, and that her sensation and reflexes were also intact, suggesting her nerves were undamaged.  Id. at PageID.663–664, 15:9–16:7.  Groen's range of motion through her neck and lower back was normal, too, though she reported pain with some neck movements.  Id. at PageID.664–666, 16:12– 18:3.  Orloski determined that her range of motion and reported pain ruled out herniated discs or neurological compromise as the cause of her pain.  Id. at PageID.664–666, 16:12–18:3. Additionally, Orloski tested Groen for radicular symptoms, like pain, numbness, tingling, or weakness in the extremities, which would have been evidence of nerve impingement.  Id. at PageID.666, 18:15–24.  During his exam, he found none.  Id. at PageID.666–667, 18:25–19:5.

Again, Orloski believed this evidence ruled out nerve problems, like those caused by herniated discs, as the cause of her pain. Id. at PageID.667, 19:6–11.

Orloski concluded that there was no objective basis to believe Groen had suffered traumatic neck or back injuries. Id. at PageID.674, 26:17–22. Additionally, he found no objective indications that Groen required cervical fusion surgery. Id. at PageID.672, 24:4–7. Orloski was unable to relate Groen's neck injuries to the accident based on his examination. Id. at PageID.674, 26:17–22. Nevertheless, he confirmed at his deposition that surgery appeared reasonable based on the findings of Dr. Mohan Ys, the doctor who ultimately performed Groen's neck and back procedures. Id. at PageID.684–685, 36:23–37:7.[2]

### 4. Examination by Independent Medical Examiner, Dr. Schoenherr

A few months after Orloski's examination, Dr. Christopher J. Schoenherr performed an independent medical examination on Groen, on January 18, 2021. Schoenherr Dep. at PageID.714, 9:2–13 (Dkt. 50-2). He reviewed Groen's medical records, conducted a physical examination, and reported his findings. Id. at PageID.714–715, 9:1310:6.

Schoenherr found that Groen had normal neurological functioning. Id. at PageID.731, 26:19–22. He also reviewed MRIs, EMGs, and CT scans of Groen's neck, which he believed indicated essentially degenerative changes, not traumatic ones. Id. at PageID.724–725, 19:25–20:15; PageID.731–733, 26:8–28:13. He reviewed a post-accident MRI of her lower back, which he also concluded evidenced essentially degenerative changes. Id. at PageID.734, 29:10–25. Based on his review and examination, Schoenherr did not expect that Groen would need spinal fusion surgery. Id. at PageID.732, 27:20–25.

---

[2] Following the convention of the parties, Dr. Mohan Ys is referred to in this opinion as "Mohan."

### 5.   Neck and Back Surgeries by Dr. Mohan

Shortly after seeing Schoenherr, Mohan examined Groen.  Mohan Initial Evaluation (Tr. Ex. 76, Dkt. 44-10).  Mohan's testing found weakness in Groen's right hand, indicating a spinal issue in the C5-C6 region.  Mohan Dep. at PageID.1054–1055, 9:21–10:25 (Dkt. 54-2).  Mohan also believed Groen's MRIs indicated spinal cord compression.  Id. at PageID.1056–1058, 11:23–13:3.  Additionally, Mohan discovered Groen has a nerve root cyst, called a Tarlov cyst, in her lower back, which he attributed to the accident. Id. at PageID.1075, 30:9–12.   However, he admitted that such cysts can occur in the absence of trauma, so "God only knows" what actually caused it. Id. at PageID.1089–1090, 44:4–45:8.  Mohan also discovered an SI joint tear, which he similarly attributed to the accident.  Id. at PageID.1075, 30:6–8.  Earlier testing by Mohan and Schoenherr had not indicated any SI joint issues.  Id. at PageID.1093–1095, 48:17–50:16.  And Mohan indicated that Groen's job as a home health aide would "definitely affect the discs," and thus may be responsible for some of her back pain.  Id. at PageID.1092–1093, 47:5–48:7. Ultimately, Mohan indicated that the cause of an SI joint tear is "[v]ery hard to pin down."  Id. at PageID.1098, 53:1–23.

 Nevertheless, Mohan stated that he believes to a reasonable degree of medical certainty that the accident caused Groen's cervical disc hernia, the Tarlov cyst he discovered, and her lower back pain.  Id. at PageID.1103–1105, 58:10–60:4.  But he recognized that his opinion was based in large part on what Groen told him about the accident and her medical history. Id. at PageID.1103–1104, 58:22–59:9.

After his examination, Mohan operated on Groen twice.    In April 2021, he performed spinal fusion surgery to address the disc herniations in her neck.  Mohan Surgical Rep. (Tr. Ex. 94, Dkt. 44-14).  The surgery was successful, with Groen reporting her pain resolved with no

complaints by June 29, 2021.  Groen Test. at PageID.1350–1351, 202:13–203:1.  About a year later, Mohan implanted a device to stimulate muscles in Groen's lower back.  Mohan Dep. at PageID.1098–1100, 53:24–55:24.  He believed that Groen's multifidus muscle had atrophied due to her sedentary lifestyle, which was the result of her other injuries.  Id. at PageID.1101, 56:4–16.

## II.  ANALYSIS

The Court first considers the liability issues.  These include the questions of negligence, the "sudden emergency" doctrine, causation of harm, and related expert witness challenges.  The Court then address the issue of damages.

### A.  Certain Testimony of Timothy Robbins is Inadmissible

The Government argues that it should not be held legally responsible for Groen's injuries by virtue of the "sudden emergency" doctrine.  In support of this position, it seeks to exclude certain testimony of Groen's crash reconstructionist, Timothy Robbins.

Specifically, the Government claims that Robbins made statements that "go to the legal cause" of the accident: (i) that Perry was solely responsible for the accident, (ii) that Perry violated two Michigan statutes, and (iii) that the sneeze was not a viable legal defense.[3]  Gov. Br. Supp. PFFCL at 20.  The Government argues that witnesses may not testify to legal conclusions, Def. Obj. to Limit Robbins Testimony at 4 (Dkt. 47), citing authorities, such as Torres v. Cnty. of

---

[3] Specifically, the Government challenges the following testimony: (i) Robbins' statement that Perry "was the sole causative factor" in the accident; (ii) Robbins' statement that "[Perry] violated the law that says we must maintain our lane of travel.  He violated the law [by] crossing a double yellow center line.  He violated . . . basic speed law [by] traveling too fast for conditions to maintain his lane of travel. Collectively, that could be deemed as careless driving"; and (iii) when asked whether he believed the sneezes excused Perry's actions, Robbins' statement that "[he doesn't] believe it does."  Robbins Test. at PageID.1279–1280, 131:9–132:23 (Dkt. 57).

Oakland, 758 F.2d 147, 151 (6th Cir. 1985), that rely on Federal Rule of Evidence 702.[4]  Groen, meanwhile, contends that Robbins' testimony on these points is permissible and useful to the Court as it explicates the enforcement and violation of traffic statutes. Pl. Resp. to Def. Obj. to Limit Robbins Testimony at 2 (Dkt. 49).

"The best resolution of this type of problem is to determine whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular."   Torres v. Cnty. of Oakland, 758 F.2d at 151.   Legal conclusions include statements that something was "unlawful," whether someone had "capacity to make a will," or the legal cause of an accident, where the factual cause is undisputed. Id. at 150–151.  Whether Perry violated the statute and whether Perry's sneezes should be legal defenses to liability are, in this context, legal conclusions.  Although Robbins' statements as to the cause of the accident could be merely factual, in context they come within the prohibition of experts offering legal conclusions.

The Government's objection is sustained.

## B.  Perry Negligently Crashed into Groen

The Government does not dispute that Perry violated Michigan law when he crossed into Groen's lane, and that violation of a statutory duty prima facie constitutes negligence.  Gov. Br. Supp. PFFCL at 23 (citing Mich. Comp. Laws § 257.642(1); Stuth v. Home-Owners Ins. Co., No. 357244, 2022 WL 5392374, at *5 (Mich. Ct. App. Oct. 6, 2022); McKinney v. Anderson, 129 N.W.2d 851, 853 (Mich. 1964)).   Nevertheless, the Government argues that the "sudden

---

[4] Federal Rule of Evidence 702 permits expert testimony if the proponent demonstrates that it is more likely than not that "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  Fed. R. Evid. 702.

emergency" doctrine, which excuses the statutory violation on which the inference of negligence is based, applies here.  Id.  The Court disagrees that Perry's sneezing fit qualifies as such an emergency.

The predictability and severity of an event are relevant to the "sudden emergency" inquiry. White v. Taylor Distrib. Co., Inc., 753 N.W.2d 591, 593 (Mich. 2008).  In White, there was a material issue of fact as to whether a driver passing out was a "sudden emergency" because he had felt ill about half an hour before.  Id. at 593–594.  But here, the Government argues, there was no such warning.  Moreover, the Government points to Zabunoff v. Walker, 192 Cal. App. 2d 8, 11 (1961), where the court recognized that "[s]ince a sneeze is a reflex action which could not necessarily be anticipated by a reasonably prudent person, the jurors could have concluded that the sneeze was an intervening cause similar to a fainting spell and that no negligence on the part of respondent was thus established."  Putting these cases together, the Government contends that the sneeze was a reflex action, which Perry could neither predict nor control once it occurred, creating a "sudden emergency."  Gov. Br. Supp. PFFCL at 25.

The Government's attempt to turn sneezes into an emergency is ultimately unpersuasive. Perry testified that he could see the road while he sneezed; moreover, he testified that he was able to react and depressed his brakes.  Perry Test. at PageID.1193–1194, 45:14–46:2; PageID.1186– 1187, 38:15–39:4.  The Court finds the sneezing fit was less disabling than the fainting spell in White, despite the comparison drawn in Zabunoff.  Moreover, Perry testified he was able to feel the sneezes coming on, again distinguishing these facts from those in White.  Perry Test. at PageID.1216, 68:5–10.

The lack of cases holding that sneezes qualify as sudden emergencies under Michigan law is unsurprising.  Distracting though they may be, sneezes are categorically less severe than the

situations courts have recognized as sudden emergencies.  See, e.g., Lepley v. Bryant, 57 N.W.2d 507, 512–513 (Mich. 1953) (suggesting sudden emergencies may include a horse leaping in front of a car, or a pedestrian suddenly stepping backwards into the path of traffic); Vander Laan v. Miedema, 188 N.W. 2d 564, 567 (Mich. 1971) (suggesting a blizzard is the prototypical example of a "sudden emergency").  The doctrine does not apply here.

Without any excuse under the "sudden emergency" doctrine, the Government effectively concedes—and the Court so finds—that Perry's conduct amounted to negligence.

### C.  The Etiology Testimony of Drs. Swift and Mohan is Admissible

Part of the analysis of whether the accident caused Groen to suffer the injuries of which she complains turns on the testimony of Swift and Mohan.  The Government challenges part of their testimony, arguing that, as it relates to their testimony about the cause of Groen's injuries, "their methodology and qualifications fail[] to meet the standard required by Federal Rule of Evidence 702 . . . ."  Gov. Br. Supp. PFFCL at 13.  The Government argues that "a treating physician's causation opinion based only on the patient's self-reporting of symptoms and history, combined with the physician's experience diagnosing an issue, does not meet Rule 702's reliability requirements."  Id. at 16.

The Government points to Tamraz v. Lincoln Elec. Co., 620 F.3d 665 (6th Cir. 2010). There, the Sixth Circuit dealt with expert testimony as to the cause of a plaintiff's Parkinson's disease.  Tamraz, 620 F.3d at 667–668.  An expert testified that he believed exposure to manganese, an iron-like metal, caused the plaintiff to develop Parkinson's.  Id.  But his reasoning was tenuous: (i) Tamraz was exposed to welding fumes presumably containing manganese; (ii) he developed the symptoms of Parkinson's disease ; (iii) scientists have identified genetic factors that cause some forms of otherwise "idiopathic" Parkinson's disease; (iv) some literature has

hypothesized that toxins combined with genetics may cause other cases of Parkinson's disease; (v) manganese is a possible candidate for triggering Parkinson's disease; (vi) Tamraz may have the genes for Parkinson's disease; and (vii) manganese may have triggered these genes and given Tamraz the disease. Id. at 670. The court found this speculative chain insufficiently reliable for admission as expert testimony. Id. Notably, many cases of Parkinson's disease are "idiopathic," meaning of unknown cause. Id. at 668. The expert's etiology opinion, for a disease that is often of unknown cause, was deemed speculative under Rule 702. Id. at 677.

The Government additionally points to Finley v. Mora, where the Sixth Circuit affirmed a district court's decision to exclude a physician's etiology opinion in a car accident case. Finley, No. 22-1886, 2023 WL 7550447 (6th Cir. Nov. 14, 2023). The doctor there based his causation opinion on the patient's history, the patient's MRI records, and the doctor's experience operating on the plaintiff. Id. at *3. The doctor in that case held fundamentally erroneous beliefs about the nature of the accident—for example, he testified that he understood that the patient received the brunt of a tractor-trailer collision while in a parked car, rather than in his own tractor-trailer. Id. The Sixth Circuit held that it was not an abuse of discretion to find that the doctor's information was insufficient to support admission of an etiology opinion. Id. (citing Rolen v. Hansen Beverage Co., 193 F. App'x 468, 473 (6th Cir. 2006); Tamraz, 620 F.3d at 673).

Drawing on these cases, the Government attacks Swift's testimony by arguing that he had insufficient knowledge to determine what caused Groen's shoulder trauma, despite having the requisite information to make a diagnosis. Gov. Br. Supp. PFFCL at 14–15. It argues that he knew no details about the accident, did not know that Groen did not complain of shoulder pain at the scene, and did not have information about other possible causes. Id. Indeed, Swift himself

acknowledged that several things could have caused the shoulder trauma, and that he could not be certain of its origin.  Swift Dep. at PageID.1007–1009, 55:20–57:2).

Similarly, the Government attacks Mohan's testimony on the theory that he lacked sufficient information to determine the cause of the Groen's neck pain, lower back pain, Tarlov cyst, and SI joint tear.  The Government contends that Mohan relied on Groen's account of the report, did not perform a differential diagnosis, and did not rule out alternative causes, despite recognizing their existence.  Critically, the Government argues, neither physician undertook an etiological analysis, and both followed the methodology Tamraz found insufficient.  Gov. Br. Supp. PFFCL at 18–19.

Groen argues that the testimony of Swift and Mohan is admissible under Federal Rule of Evidence 702. Pls. Br. Supp. PFFCL at 32 (Dkt. 58).  She first notes that treating physicians are subject to the same standards as other expert witnesses.  Id. (citing U.S. v. Betro, 115 F.4th 429 (6th Cir. 2024)).  She argues that "generally, a treating physician may provide expert testimony regarding a patient's illness, the appropriate diagnosis for that illness, and the cause of the illness." Id. (quoting Gass v. Marriott Hotel Servs., Inc., 558 F.3d 419, 426 (6th Cir. 2009)).

Groen points to a case from the Third Circuit to make her point.  Pl. Br. Supp. PFFCL at 33 (citing Matlin v. Langkow, 65 F. App'x 373, 384 (3d Cir. 2003)).  In Matlin, a doctor concluded that the injury he diagnosed had been caused by an accident after examining the plaintiff and taking the plaintiff's statement about the accident.  Matlin, 65 F. App'x at 384.  The court found it was not an abuse of discretion to hold that the doctor's knowledge of the car accident and the plaintiff's account of his symptoms—together with his general knowledge—provided sufficient basis to admit his causation opinion.  Id. at 383.  Thus, the Matlin court affirmed the district court's finding the defendant's complaints went to weight, not admissibility.  Id.

Groen posits that the same result should obtain here.  Pl. Br. Supp. PFFCL at 34.  She argues that she had no symptoms prior to the accident and was able to work full time.  Id. at 34–35.  Then, after the car accident, she suffered from her shoulder and spine symptoms.  Id. at 35.  Swift and Mohan made their etiological assessments on the basis of this timeline, as well as Groen's history, her MRI imaging, her physical exams, and her medical records.  This, Groen argues, is sufficient basis for their opinions under Rule 702, as it was in Matlin.  Id. at 34–35.

The Court agrees that the issues with the etiologies offered by Swift and Mohan go to weight, not admissibility.  The Court recognizes that a divided panel of the Sixth Circuit has permitted the exclusion of expert testimony based on self-reported history and experience.  See Finley, 2023 WL 7750447 at *3.  But the Finley court faulted the expert because he lacked a basic understanding of the underlying accident.  Id.  Here, the doctors recognized the limits of their knowledge and ability to offer etiology opinions, and they had a far stronger grasp of the underlying incident.  Although their information about the incident prior to treatment was limited, each found their opinions unchanged once they learned more information in preparation for this litigation.

Neither does Tamaraz compel a contrary result.  The etiology opinion there was exceptionally tenuous, relying on unproven medical theories to explain causation for a disease that commonly has no identifiable cause.  The doctors' sturdier reasoning in this simpler case does not rise to the level of speculation that the Sixth Circuit found unacceptable in Tamraz.  The etiology testimony of Swift and Mohan is admissible.

Next, the Court turns to whether Groen's injuries can be traced to the accident.

14

**D.  Groen's Shoulder Injury Is a Serious Impairment Attributable to the Accident**

Under Michigan's no-fault law, a plaintiff must establish that the motor vehicle accident caused "an objectively manifested impairment of an important body function that affect[s] the plaintiff's general ability to lead his or her normal life."  Mich. Comp. Laws 500.3135(7).  Courts have found that significant pain traceable to injuries to body parts—like the back, shoulder, or neck that, in turn, limit important daily activities—can satisfy this threshold requirement of the statute.  See, e.g., Washington v. Van Buren Cnty. Rd. Comm'n, 400 N.W. 2d 668 (Mich. Ct. App. 1986).

Groen's testimony established significant pain from injuries to her body and its resultant impact by limiting employment.  The Court credits Groen's testimony about her pain, anxiety, and loss of capacity to enjoy life resulting from the accident.  Groen Test. at PageID.1324–1325 176:3–177:21 (pain, anxiety, and loss of capacity to enjoy life resulting from the accident).  She could not work at all for almost a year and then her working capacity was cut in half thereafter.  Id. at PageID.1312, 164:3–11; Joseph Groen Test. at PageID.1302, 154:14–17.   She also had to limit her daily activities to because of her pain.  Groen Test. at PageID.1324 176:3–21; Joseph Groen Test. at PageID.1302–1303, 154:2–155:14.  The Government does not challenge Groen on this threshold issue, except to argue that the accident did not cause Groen's injuries.

The Government argues that Groen's shoulder injury was not caused by the accident.  The Court disagrees.  Groen's shoulder injury and her need for a subsequent surgery are attributable to the accident.   Swift's uncontested testimony indicated that Groen suffered an acceleration/deceleration injury, which he believed was at least consistent with if not attributable to the accident.  Swift Dep. at PageID.977–978, 25:8–26:7.  Although the Government points to the episode in which Groen attempted to pull herself into a truck as the genesis of her shoulder

pain, it fails to explain how such a motion could cause the type of injury in question. Gov. Br. Supp. PFFCL at 3. Pulling a handle lacks the rapid changes in speed that accompanies the types of activities Swift indicated might cause such an injury, like racket sports or combat sports. Swift Dep. at PageID.1007–1008, 55:20–56:5. In fact, Schoenherr, too, testified that he believed the accident "caused or aggravated" her shoulder condition. Schoenherr Dep. at PageID.750–751, 45:19–45:6 (Dkt. 50-2).

In sum, the Court credits Groen's testimony that she braced during the accident, Groen Test. at PageID.1313, 165:17–18, and Swift's testimony that such bracing likely explains the shoulder injury that she suffered, Swift Dep. at PageID.977–978, 25:8–26:7.

### E. Groen's Neck Injury Is Not Attributable to the Accident

The Government next argues that Groen did not meet her burden to demonstrate that the accident caused her neck injury. The Court agrees. Although Groen complained of neck pain shortly after the accident, the Court credits the findings of both independent medical examiners, who found no signs of neurological issues in their exams. Schoenherr Dep. at PageID.731, 26:14-22; Orloski Dep. at PageID.667, 19:6-14 (Dkt. 50-1). In addition, those experts believed Groen's tests revealed only normal degenerative changes. Schoenherr Dep. at PageID.725, 20:4–15; PageID.731–733, 26:8–28:13); Orloski Dep. at PageID.674, 26:17–22. Thus, two experts examined Groen and concluded she had not suffered significant neck trauma during the accident. Those findings, coupled with the fact that degenerative changes alone may cause the herniation that Groen suffered, are compelling evidence that the accident did not cause Groen's neck symptoms.

Although Mohan found neurological symptoms, he did not test Groen until nearly eight months after the accident. Mohan Dep. at PageID.1078, 33:2–7 (Dkt. 54-2). He discovered

symptoms only after two other doctors had not found them, undermining his conclusion that the accident caused Groen's neurological symptoms.  While the Court recognizes that Groen began suffering neck pain after the accident, the mixed results of her examinations and looming possibility of degeneration as an alternative explanation ultimately undermine her attempt to link her injury, and thus her surgery, to the accident.

### F.  Groen's Back Injury Is a Serious Impairment Attributable to the Accident

Finally, the Court rejects the Government's argument that Groen's back injury was not attributable to the accident.  As Mohan explained, Groen's lower back pain was attributable to an atrophied multifidus muscle. Mohan Dep. at PageID.1066–1071, 21:22–26:25.  That atrophy, in turn, is traceable to the sedentary lifestyle that Groen adopted following her various injuries and ailments.  Id. at PageID.1104, 59:10–19.  Having already determined that the accident caused Groen's shoulder injury, it follows that the accident is at least partially responsible for Groen's lower back condition.  Although Groen suffered lower back pain in the past, this bout of pain was traced specifically to an inactive lifestyle.  And Groen would not have been so sedentary but for the accident.  See Joseph Groen Test. (Dkt. 57, PageID.1301–1303, 153:25–155:14) (describing how Groen went from a relatively active lifestyle before the accident to a relatively sedentary one afterwards).  Thus, the Court concludes that the accident caused Groen's back pain and necessitated her lower back surgery.

### G.  Damages

#### 1.  Economic Damages

The Court finds that Groen has established by a preponderance of the evidence that she is entitled to economic damages for lost and diminished wages.  Groen has already recovered economic damages for the three years following the accident via Michigan's no-fault tort law.

Mich. Comp. Laws § 500.3135(3)(c).  She bears the burden now of showing that she suffered economic damages beyond that three-year cutoff (i.e. after May 5, 2023).  See Harms v. United States, No. 15-13215, 2017 WL 3642202, at *12 (E.D. Mich. Aug. 24, 2017).  She also has a duty to mitigate damages. See Mathis v. Encompass Ins. Co., No. 06-13837, 2008 WL 239836, at *11 (E.D. Mich. Jan. 29, 2008) (citing Bak v. Citizens Ins. Co of America, 503 N.W.2d 94 (Mich. App. 1993)).  The Court finds that Groen has carried her burden here and is entitled to economic damages from May 5, 2023 into the future.

Regarding economic damages, the Court credits Groen's testimony that she was unable to work between May 5, 2023 and April 1, 2024, when she returned to the home health aide company where she was employed before the accident. Groen Test. at PageID.1358, 210:6–9.  Groen did not complete her final surgery until June 28, 2023, nine months before she returned to work. Mohan Progress Notes at 1 (Tr. Ex. 142, Dkt. 44-24).  That is a significant recovery period, but the Court believes Groen's testimony that she required this time to recover.  Groen Test. at PageID.1311, 163:10–25.  Although the Government argues that Groen could have sought a sedentary job, and thus failed to mitigate, the Court again credits Groen's testimony that her pain made such work difficult if not impossible.  Id. at PageID.1360, 212:8–15.  Groen is entitled to damages for the period between May 5, 2023 and April 1, 2024 at her prior weekly salary rate $37,000 per year. Id. at PageID.1311, 163:6–9.

In addition, the Court finds that Groen is similarly entitled to damages owing to her reduced earning capacity once she returned to her old job.  Here again, the Court credits Groen's and her son's testimony that ongoing pain has halved her earnings. Id. at PageID.1312, 164:3–11; Joseph Groen Test. at PageID.1302, 154:14–17.  Although it is not possible to be certain of the extent of the damages here, the Court finds Groen's diminution in earnings by one-half to be a reasonable

approximation.  Therefore, damages attributable to Groen's diminished earning capacity are based on half of Groen's prior salary.

The starting point of the diminished earnings is clear enough—the day she resumed work on April 1, 2024.  The end point requires some analysis.  The Court credits Groen's testimony that she intended to work into her 70s, Groen Test. at PageID.1331, 183:11–15, and notes that she was born in June of 1966.  Id. at PageID.1332, 184:1–2.  Therefore, it deems Groen eligible for damages until June 1, 2036.

For the period when she could not work at all—from May 5, 2023 until April 1, 2024—her loss of earnings would be $33,442.31.[5]  For the period thereafter and until June 1, 2036, the loss of earnings would be $225,557.69.[6]  Total economic damages are thus $259,000.

The Court is not required to discount these future earnings to present value, and the Government has not asked it to do so. See Jackson v. City of Cookeville, 31 F.3d 1354, 1361 (6th Cir. 1994) (recognizing that a "reasonable approximation of" the present value of future earnings "can be obtained by simply multiplying his present salary by [expected work years] and neither including future pay raises nor applying a discount rate").

## 2. Non-Economic Damages

The Court also finds that Groen is entitled to non-economic damages.  But the Court rejects Groen's proposed "dollars per-hour" approach to calculating these damages, along with its fixed

---

[5] Based on 47 weeks of no earnings and a pre-accident annual earnings of $37,000, the calculation is 47 x ($37,000/52) = $33,442.30.

[6] Based on 634 weeks of reduced earning capacity and an annual decrease in earnings of $18,5000 (i.e., a fifty percent reduction in earning capacity), the calculation is 634 x ($18,500/52) = $225,557.69.

sums for her surgeries. Groen cites no authority in favor of these methods, nor does she explain how she reached the numbers she urges.

The Court credits Groen's testimony about her pain, anxiety, and loss of capacity to enjoy life resulting from the accident. Groen Test. at PageID.1324–1325 176:3–177:21. It also credits her testimony about the limitations she faces, including needing to limit her activity to avoid "terrible, terrible pain." Id. at PageID.1324 176:3–21. Similarly, it credits her son's testimony about how the accident has changed his mother's life—for example, that as little as a 30-minute car ride sometimes proves so taxing that she has to rest for the rest of the day. Joseph Groen Test. at PageID.1302–1303, 154:2–155:14.

Considering this testimony and all the circumstances, the Court awards Groen $50,000 for her past pain and suffering and $150,000 for future pain and suffering.

These figures accord with the results in other cases. For example, in Porras v. United States, the court awarded an FTCA plaintiff $100,000 in past non-economic damages where she suffered shoulder and spinal injuries from a car accident plus a small award $35,000 for future damages as her symptoms had lessened over time. Porras, 21-cv-423, 2023 WL 2583303, at *29–30 (M.D. Fla. Mar. 21, 2023); see also McIntyre v. United States, 14-cv-164, 2016 WL 4702417, at *6 (M.D. Fla. Sept. 8, 2016) (awarding $150,000 in non-economic damages where the plaintiff suffered knee, hip, and spine injuries). In total, the Court finds Groen entitled to a non-economic damages award of $200,000.

### 3. Total Damages

The Court awards Groen $259,000 for her economic damages and $200,000 for her non-economic damages. In total, Groen is entitled to an award of $459,000.

## III. CONCLUSION

The Court concludes that Groen has established her right to recover in the total amount of

$459,000.  Judgment will be entered accordingly.

SO ORDERED.

Dated: March 30, 2025                              s/Mark A. Goldsmith
Detroit, Michigan                                  MARK A. GOLDSMITH
                                                   United States District Judge